2018 IL App (2d) 160903
No. 2-16-0903
Opinion filed August 24, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 78-CF-317 |
| | ) | |
| PHILLIP E. LaPOINTE, | ) | Honorable |
| | ) | Robert A. Miller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1   Defendant, Phillip E. LaPointe, appeals a judgment denying him leave to file a successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). See *id.* § 122-1(f).  Defendant's proposed petition claimed that his life sentence for murder (Ill. Rev. Stat. 1977, ch. 38, § 9-1(a)) violated both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).  He contends that the trial court erred in ruling that he did not establish cause for his failure to raise his claims in his first petition under the Act and prejudice as a result of the omission (see 725 ILCS 5/122-1(f) (West 2016)).  We affirm.

¶ 2    On March 7, 1978, Peter Moreno, a taxi driver, was shot to death in his cab. Defendant, who was born January 29, 1960, was charged with murder and armed robbery. On June 16, 1978, he entered an open plea of guilty to murder. The State dismissed the armed-robbery charge.

¶ 3    The factual basis relied heavily on what David Cichelli had told the police earlier. On the morning of March 7, 1978, defendant visited Cichelli at the gas station where the latter worked and told Cichelli that he was going to rob and kill a cab driver. Defendant showed Cichelli a loaded .22-caliber revolver. Shortly afterward, defendant left, walked two blocks, and called for a cab. Moreno arrived, picked him up, and drove to the area of York Commons. Defendant shot Moreno twice in the head. Defendant drove the cab, with Moreno's body inside, a short distance and left it there. Defendant took some money from Moreno, returned to the gas station, and told Cichelli that he had killed Moreno. He added that he did it because Moreno could identify him.

¶ 4    The factual basis continued as follows. Later that day, the police found the cab, with Moreno's body inside. On March 8, 1978, defendant was arrested. He admitted that he had called for the cab, that he was in it when he heard two shots fired, and that only he and Moreno had been in the cab then. Defendant said that the gun was in his home. The police searched the home and found the gun. When defendant shot Moreno, he was not under the influence of drugs or experiencing any mental incapacity that negated the intent required for murder.

¶ 5    The presentencing investigation report (PSIR) revealed that defendant's parents divorced when he was three and that his mother, Delores Malo, had custody of him for most of the following years. She had remarried twice. Defendant had a poor relationship with his stepfather William Malo. Defendant submitted a statement in which he said that he was under the influence of LSD on March 7, 1978. He remembered calling for the cab, talking to the driver,

and leaving the cab later, but he did not recall the shooting itself. The PSIR revealed that defendant had a burglary conviction for which he was still serving a three-year probation term.

¶ 6 At the sentencing hearing, held August 31, 1978, Cichelli testified consistently with the factual basis at the guilty-plea hearing. He added that defendant told him that he had committed the murder for money but that it was not worth it. Police sergeants who had examined the scene testified that Moreno had been shot twice from behind at close range and that there was no money or identification on him. Three deputy sheriffs who had worked at the Du Page County jail testified that, late in March and early in April 1978, they saw defendant wearing a T-shirt inscribed, "Elmhurst Executioner." Joseph Ray, a 16-year-old, testified that, a few weeks before defendant was arrested, defendant asked Ray to help him rob a drugstore cash register. Before then, they had burglarized a home. Also, defendant telephoned Ray from jail and asked him to get him some " 'hash,' " but Ray refused.

¶ 7 In mitigation, Delores and William testified that defendant had a serious drug problem. Also, defendant's relationship with William had deteriorated in recent years, which Delores attributed to William's excessive drinking and William attributed to defendant's use of drugs. Both Malos testified that they had never known defendant to be violent toward anyone. Reverend Erling Jacobson testified that he had tried to help defendant with his drug problem but also believed that defendant was dangerous and needed to be locked up. In allocution, defendant told the court that, on March 7, 1978, he had been under the influence of LSD. He said that he could not remember whether he had killed Moreno; if he did, "it was the LSD."

¶ 8 The State urged a sentence of life without parole. It argued that defendant's drug use was not mitigating and might incline him to commit more crimes. Further, his offense was premeditated, unprovoked, and done solely for money. He murdered Moreno a few months after

starting probation for burglary. Finally, his crime was exceptionally brutal or heinous, showing wanton cruelty, and committed in the course of another felony.

¶ 9    Defendant argued that life was excessive; he was not only young but "very young emotionally." He was "capable of, sometime, providing society with some responsible behavior *** when he matures, he may be able to exercise some of that responsible behavior." Defendant urged the court to give him the hope that he could "return to society as a useful individual."

¶ 10    On September 18, 1978, the court sentenced defendant. The judge stated as follows. Defendant's conduct showed "premeditation and a calculated deliberateness." No factors in mitigation applied. In aggravation was one that would have authorized a death sentence: defendant murdered Moreno in the course of committing an armed robbery, and he did so intentionally or knowing that his act created a strong probability of death or great bodily harm to Moreno. See Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 9-1(b)(6)(b). The judge continued:

> "So, the Court, in taking into consideration the heinous nature of this crime, its
> brutality, its cold, calculating, cold-blooded act which is indicative of the wanton cruelty,
> there was an indication it was premeditated and post meditated [*sic*], *** the defendant
> *** shall serve a life sentence, without parole."

¶ 11    The sentence was based on a statutory provision authorizing a life sentence for murder if the court found that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1).

¶ 12    Defendant filed a notice of appeal but then moved to reconsider the sentence. The trial court refused to hear the motion, holding that the notice of appeal had divested it of jurisdiction. On appeal, defendant argued that the court had erred in finding that his conduct had been exceptionally brutal or heinous. We agreed. We explained that defendant did not have a

significant history of criminal activity: he had pleaded guilty to committing a burglary when he was 17 and was given three years' probation, and he never committed the drugstore robbery or received the "hash" in the jail. Further, defendant had had a difficult home situation, problems with drug abuse, limited educational and work histories, and no prior involvement "with the use of violence." *People v. LaPointe*, 85 Ill. App. 3d 215, 222 (1980).

¶ 13   We also relied on the proportionate-penalties clause, noting that it required all penalties to be determined " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' "   *Id.* at 222-23 (quoting Ill. Const. 1970, art. I, § 11). We concluded from the record, and from the fact of the life sentence, that although the trial court had considered the seriousness of the offense, it had failed to evaluate the possibility that "defendant could at some future date be restored to useful citizenship."   *Id.* at 223. Therefore, we reduced defendant's sentence to 60 years, the maximum nonextended term.   *Id.* at 224.

¶ 14   The supreme court reversed us, holding that the trial court had not abused its discretion. *People v. La Pointe*, 88 Ill. 2d 482, 492-93 (1981). Although defendant argued that the proportionate-penalties clause required the trial court to make specific findings concerning his rehabilitative potential, the supreme court held that the clause did not require the judge "to detail for the record the process by which he concluded that the penalty he imposed was appropriate." *Id.* at 493. The judge had "carefully considered the evidence within the prescribed statutory framework." *Id.* Moreover, he had specifically rejected any argument that defendant's criminal conduct was the result of circumstances unlikely to recur or that his character and attitude indicated that he was unlikely to commit another crime. *Id.*; see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-5-3.1(a)(8), (a)(9).

¶ 15    The court also disagreed with our statement that defendant lacked a significant criminal history: in addition to the burglary conviction, he had possessed and used illegal drugs over two or three years and had solicited Ray to assist him in a robbery and to smuggle drugs into the jail. *La Pointe*, 88 Ill. 2d at 494.   The court held that we erred in stating that these unconsummated offenses could not be considered in aggravation.  *Id.* at 494-95.

¶ 16    Finally, the court rejected defendant's arguments that the "brutal or heinous" provision (Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1)) was unconstitutional and that the trial court abused its discretion in applying it to him.  On the latter point, the court stated:

> "The record in this case indicates that the defendant, a young man with a significant history of criminal activity, acted with premeditated, cold-blooded deliberation in deciding to kill a cab driver, a homicide for which the death penalty could have been sought ***.  Following that murder and while being held in jail, he displayed a callous attitude and a complete lack of remorse by wearing the tee shirt with the words 'Elmhurst Executioner' appearing thereon.  We do not believe that the trial judge can be said to have abused his discretion in sentencing defendant to natural life imprisonment without parole."  *Id.* at 501.

¶ 17    Defendant brought numerous collateral actions.  In his first postconviction petition, filed in 2002, he claimed that his trial attorney had been ineffective for failing to inform him that, if he accepted a plea offer that included a 40-year sentence, he would have been eligible for day-for-day good-conduct credit; for assuring him that he would not receive an extended-term sentence; and for failing to move to withdraw the guilty plea even though defendant had asked him to do so.  The trial court summarily dismissed the petition.  We affirmed.  *People v. LaPointe*, 341 Ill. App. 3d 1118 (2003) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 18    In 2008, defendant moved for leave to file a successive petition, which would again claim that his trial attorney had been ineffective for failing to move to withdraw the guilty plea. The trial court denied the motion. We affirmed. *People v. LaPointe*, 403 Ill. App. 3d 1109 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23). The supreme court directed us to vacate our judgment and to remand the cause to allow defendant to file a successive petition limited to the claim that his attorney had been ineffective for failing to move to withdraw the plea. *People v. LaPointe*, No. 111395 (Ill. Jan. 26, 2011) (supervisory order). After defendant did so, the trial court dismissed the ineffectiveness claim insofar as it relied on counsel's failure to inform defendant of the good-conduct credit. After holding an evidentiary hearing on whether counsel had been ineffective for inducing defendant to plead guilty based on the assurance of no extended-term sentence, the court denied defendant relief. We affirmed. *People v. La Pointe*, 2015 IL App (2d) 130451.

¶ 19    On August 11, 2016, defendant filed the motion at issue here. Paragraph No. 8 stated, "The claim [defendant] wishes to raise in his successive petition *** is that Eighth Amendment principles, as set forth in *Miller v. Alabama*, [567 U.S. 460] (2012), should be applied to [defendant], who turned 18 only 37 days before the offense in question here, and where the evidence shows he was not a mature adult." Paragraph No. 9 addressed section 122-1(f)'s cause-and-prejudice test, which required him to "identify[ ] an objective factor that impeded his *** ability to raise a specific claim during his *** initial post-conviction proceedings" and "demonstrat[e] that the claim not raised *** so infected the trial that the resulting conviction or sentence violated due process." 722 ILCS 5/122-1(f) (West 2016). It argued that *Miller* was decided in June 2012 and that under *People v. Davis*, 2014 IL 115595, this was sufficient cause.

¶ 20    As to prejudice, the motion alleged that *Miller* applied retroactively to collateral actions (see *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016)) and that the record showed that, in sentencing defendant, the trial court had failed to consider several of the mitigating factors that *Miller* required. These included defendant's youth, his family situation and home environment, his emotional and mental health history, and his potential for rehabilitation.

¶ 21    Under the concluding paragraph, headed "Relief Requested," defendant's motion asked the court to allow the proposed petition and to "find that the 8th Amendment, as well as due process under the 14th Amendment, was violated by [the] improper sentencing hearing." Nowhere did the motion itself refer to the Illinois Constitution's proportionate-penalties clause.

¶ 22    The proposed successive petition, attached to the motion, argued as follows. Based on scientific knowledge relating to mental and emotional development, *Miller* prohibits sentencing a juvenile to life imprisonment without taking into account certain mitigating factors. These factors applied here. At the time of his arrest, defendant had been under "psychological care," and, while he was in jail, he was being treated by a psychiatrist who prescribed several psychotropic drugs for him. However, the record showed that, in sentencing defendant, the trial court had been unaware of his "extensive mental health history."

¶ 23    The proposed petition next argued that *Miller* is not limited to those who were under 18 when they offended. The petition cited *People v. House*, 2015 IL App (1st) 110580. It also stated, "[Defendant] will present evidence showing he matured and changed and rehabilitated himself while in prison[.] *Lucien v. Briley*, [213 Ill. 2d 340] (2004) (cognizable under Art. I, § 11 of the Illinois Constitution)."

¶ 24    The proposed petition then alleged in detail how the trial court had failed to consider the factors that *Miller* required. Defendant cited evidence that William routinely beat Delores and

defendant, that defendant's use of LSD might have led to his crime, and that two psychologists who had examined him had not been interviewed for the PSIR or called at the sentencing hearing. Defendant alleged that, under *Miller*, the trial court had been required to consider all of these factors but, in 1978, they were not recognized as mitigating.

¶ 25 Under the heading "Rehabilitation," the proposed petition continued as follows. The trial court had violated *Miller* by failing to consider defendant's potential for rehabilitation. Moreover, in prison, defendant had demonstrated such potential, incurring no major rule violations and earning his GED. The court, of course, could not have taken all of this into account. The proposed petition continued:

"If our Constitution holds that 'all penalties shall be determined *both* according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship.' [*sic*] Ill. Const. 1970, art. I, § 11. Then truely [*sic*] the trial court in this instance violated such a mandate and the Eighth Amendment by failing to consider [defendant's] potential for rehabilitation when clearly there are paper trails showing such rehabilitation has occurred." (Emphases in original.)

¶ 26 In the "Summation," the proposed petition alleged first that the trial court had violated *Miller* by failing to consider numerous mitigating factors. Further, the evidence showed that defendant was "one of the most rehabilitated inmates in the system, and therefore [it was] in violation of [the proportionate-penalties clause] to have first not considered his rehabilitative potential, but then to keep a rehabilitated individual incarcerated when it serves no purpose."

¶ 27 The proposed petition attached an affidavit dated June 9, 2003, from Delores. (The affidavit had been filed in a previous collateral action.) She recounted defendant's poor relationship with William, his drug use, and his 1977 concussion that resulted in bouts of

amnesia, a fact not brought out at the sentencing hearing. Further, a hospital blood test had shown that defendant was under the influence of LSD at the time of the murder, but this was not brought out at the hearing either.

¶ 28  The proposed petition also attached defendant's affidavit, dated August 6, 2016. In it, he stated that, starting in 1975, he developed severe psychological disorders; two examining psychologists separately diagnosed him as manic-depressive with underdeveloped brain functioning. In prison, he received a similar diagnosis and was placed on psychotropic medicines until 1983. He had suffered two concussions, one when he was approximately 8 and one when he was 17, and he had become a regular user of marijuana and LSD in the three years preceding the murder.

¶ 29  The trial court denied defendant leave to file the proposed successive petition. The court's written order explained that *Miller* held that sentencing a person who was under 18 when he offended to mandatory life without parole violates the eighth amendment. However, defendant was over 18 when he murdered Moreno, so *Miller* did not apply. The order did not mention any proportionate-penalties claim.

¶ 30  Defendant moved to reconsider, contending that *Miller*'s reasoning, if not its holding, supported his eighth-amendment claim. His motion did not note the judgment's omission of any reference to the proportionate-penalties clause or argue that a claim based on it survived the cause-and-prejudice test. The court denied defendant's motion. He timely appealed.

¶ 31  On appeal, defendant contends that he met section 122-1(f)'s requirements. On cause, he argues that *Miller*, the basis of his eighth-amendment claim, was issued after he was sentenced but applies retroactively to his case. On prejudice, he argues that *Miller* did not set a bright-line

rule limiting its holding to offenders under 18 and that his sentence violated the proportionate-penalties clause.

¶ 32    We hold that defendant has failed to satisfy section 122-1(f).  Therefore, we affirm the denial of his motion for leave to file a successive petition.

¶ 33    We review *de novo* the denial of leave to file a successive petition under the Act.  *People v. Love*, 2013 IL App (2d) 120600, ¶ 27.  We consider defendant's arguments in turn.

¶ 34    Defendant contends first that his eighth-amendment claim under *Miller* is valid even though he was over 18 years old when he committed his offense.  He asserts that *Miller* and two preceding decisions of the Court, *Graham v. Florida*, 560 U.S. 48 (2010) (holding unconstitutional sentence of life without parole for juvenile who did not commit homicide), and *Roper v. Simmons*, 543 U.S. 551 (2005) (barring execution of person under 18 at the time of offense), did not draw a bright line ruling out anyone over that age.

¶ 35    Defendant acknowledges that this court, and others, have held otherwise.  In *People v. Horta*, 2016 IL App (2d) 140714, ¶ 84, we stated, "[*Miller*, *Graham*, and *Roper*] explicitly limit their scope to the sentencing of those who were under 18 years old at the time of their crimes."  Accord *People v. Pittman*, 2018 IL App (1st) 152030, ¶¶ 30-31; *People v. Thomas*, 2017 IL App (1st) 142557, ¶ 28.  Defendant contends that these cases misread *Miller*, and he requests that we depart from their holdings.  We disagree with the contention, and thus we decline the request.

¶ 36    In *Roper*, the Court framed the issue as whether the eighth amendment (and thus the fourteenth) made it "permissible *** to execute a juvenile offender who was older than 15 but younger than 18 when he committed a capital crime."  *Roper*, 543 U.S. at 555-56.  After discussing the "general differences between juveniles under 18 and adults" (*id.* at 569), the Court held, "When a juvenile offender commits a heinous crime, *** the State cannot extinguish his

life and his potential to attain a mature understanding of his own humanity." *Id.* at 573-74. The Court continued:

> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity that some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." *Id.* at 574.

¶ 37 It is hard to imagine a clearer statement of a bright-line rule than the foregoing. In *Graham* and *Miller*, the Court drew on *Roper* and in no way departed from its limitation to those who were under 18 when they offended. Indeed, in *Graham*, the Court stressed that "penological theory is not adequate to justify life without parole for *juvenile* nonhomicide offenders" and proscribed imposing a life sentence on "a *juvenile* offender who did not commit homicide." (Emphases added.) *Graham*, 560 U.S. at 74. In *Miller*, the Court's holding was that "mandatory life without parole *for those under the age of 18 at the time of their crimes* violates the Eighth Amendment[ ]." (Emphasis added.) *Miller*, 567 U.S. at 465. Nothing in *Miller* remotely implies that the Court wished to blur the bright-line rule that it had created in *Roper* and reiterated in *Graham*.

¶ 38 In contending that *Miller* does not categorically exclude those who committed their offenses after they turned 18, defendant relies on *House*, 2015 IL App (1st) 110580, and *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016). Defendant's reliance on these opinions to avoid the plain

meaning of Supreme Court precedent is inherently flawed, but we discuss them to explain why they are unpersuasive.

¶ 39     In *House*, the defendant was convicted of two counts of first-degree murder, based on his role as a lookout for those who actually killed the victims. *House*, 2015 IL App (1st) 110580, ¶ 82. By statute, he was sentenced to mandatory life imprisonment because there was more than one victim. *Id.*; see 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). At the time of his offenses, he was 19 years old. *House*, 2015 IL App (1st) 110580, ¶ 83. Eventually, he petitioned under the Act, claiming in part that the mandatory life sentence violated both the eighth amendment and the proportionate-penalties clause. *Id.* ¶ 1. The trial court dismissed the petition, and he appealed. *Id.* ¶¶ 34-35.

¶ 40     On appeal, the defendant reiterated his constitutional challenges to the mandatory-life statute. He contended both that the provision was facially unconstitutional and that "the sentence [was] invalid as applied to him because of his age and minimal involvement in the commission of the crimes." *Id.* ¶ 80. The appellate court first considered the "as-applied" challenge. It prefaced its discussion with a recitation of the basic principles of the state constitutional provision (*id.* ¶ 85), including that " '[a] statute may be deemed unconstitutionally disproportionate if *** the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Id.* (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)). The court observed that, in *Miller*, our supreme court held that a mandatory sentence of life without parole violated the proportionate-penalties clause as applied to a defendant who had been convicted under an accountability theory of a murder that occurred when he was 15 years old. The sentence was so disproportionate to the facts of the case, particularly the defendant's youth and his limited involvement in the offense,

that it " 'shock[ed] the moral sense of the community.' " *Id.* ¶ 87 (quoting *Miller*, 202 Ill. 2d at 341).

¶ 41 Turning to the case before it, the *House* court stated that, although the defendant was not a juvenile at the time of his crime, his young age was "relevant in consideration under the circumstances of this case." *Id.* ¶ 89. The court "question[ed] the propriety of mandatory natural life for a 19[-]year[-]old defendant convicted under a theory of accountability," as he received the same sentence as "the person who pulled the trigger." *Id.*

¶ 42 The court continued, "Although the Court in *Roper* delineated the division between juvenile and adult at 18, we do not believe that this demarcation has created a bright line rule." *Id.* ¶ 94. For support, the court quoted the passage that we have quoted in support of the exact opposite proposition. *Id.* (quoting *Roper*, 543 U.S. at 574). The court stated, "[T]he designation that after 18 an individual is a mature adult appears to be somewhat arbitrary, especially in the case at bar." *Id.* ¶ 95. The court cited articles on adolescent brain development (*id.* ¶¶ 95-96), noted that Illinois had recently raised the maximum age for a delinquent minor from 17 to 18 (*id.* ¶ 97), quoted the Supreme Court of Wyoming's list of "factors taken from *Miller* to consider in sentencing juveniles" (*id.* ¶ 98 (quoting *Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36, 47 (Wyo. 2013))); and quoted excerpts from *Miller* and *Graham* discussing special considerations applicable in sentencing minors (*id.* ¶¶ 99-100 (quoting *Miller*, 567 U.S. at 479, and *Graham*, 560 U.S. at 70).

¶ 43 Following all of this, the *House* court stated that the defendant's mandatory life sentence "shock[ed] the moral sense of the community." *Id.* ¶ 101. Thus, it "violate[d] the proportionate penalties clause of the constitution as applied to him." *Id.* ¶ 102. The court vacated the sentence and remanded for a new sentencing hearing. *Id.* Finally, the court noted, "Since we have held

that the proportionate penalties clause is unconstitutional as applied to defendant, we need not address defendant's arguments that the impositions [*sic*] of a mandatory life sentence was facially unconstitutional under the eighth amendment and the proportionate penalties clause." *Id.* ¶ 103.

¶ 44 Defendant's argument otherwise notwithstanding, it is manifest that *House* based its holding entirely on the proportionate-penalties clause and not at all on the eighth amendment. Insofar as the court stated in *dicta* that *Roper*, *Graham*, and *Miller* did not draw a bright line at age 18, we disagree; as we said in *Horta*, the Court did so unmistakably.

¶ 45 *Sweet* does not aid defendant either. First, of course, as he acknowledges, opinions of our sister states do not bind our courts (*In re Parentage of Scarlett Z.-D.*, 2014 IL App (2d) 120266-B, ¶ 49) and need not be consulted when Illinois authority sufficiently covers the issue (*Donnellan v. First Student, Inc.*, 383 Ill. App. 3d 1040, 1064 (2008)). In any event, *Sweet* was decided under the Iowa Constitution's cruel-and-unusual-punishment clause (Iowa Const., art. 1, § 17), which the court was free to interpret more broadly than the Supreme Court had construed the eighth amendment (*Sweet*, 879 N.W.2d at 832). The court explicitly declined to consider the defendant's eighth-amendment arguments or, indeed, whether he had even preserved them for review. *Id.* at 817-18.

¶ 46 Second, the defendant was under 18 when he committed the offenses (two murders) and his argument was only that "*juvenile* offenders may never be sentenced to life without the possibility of parole." (Emphasis added.) *Id.* at 834. Thus, the court's holding was "a categorical rule that *juvenile* offenders may not be sentenced to life without the possibility of parole under *** the Iowa Constitution." (Emphasis added.) *Id.* at 839. Therefore, even were *Sweet* binding, it would be distinguishable.

¶ 47    *Miller* simply does not apply to a sentence imposed on one who was at least 18 at the time of his offense.  Thus, defendant did not show that prejudice resulted from the omission of the eighth-amendment claim from his initial petition under the Act.

¶ 48    We turn to defendant's second argument on appeal: that he satisfied the cause-and-prejudice test for his claim that his life sentence violated the proportionate-penalties clause. Defendant contends that he showed cause in that, although his claim was not based on the eighth amendment, it was based on *Miller*, which was not issued until after his initial petition under the Act had been litigated.  Thus, he maintains, at sentencing, he was denied the opportunity to present the scientific evidence, cited in *Miller*, that was pertinent to his assertion that his life sentence was unconstitutionally severe given his youth.  He also contends that he showed prejudice, based on the strength of these recent discoveries and their application to his case.

¶ 49    The State contends initially that defendant forfeited his proportionate-penalties claim by failing to raise it in the trial court.  See 725 ILCS 5/122-3 (West 2016) (any claim not raised in original or amended petition is forfeited).  The State notes correctly that defendant's motion did not mention the proportionate-penalties clause at all.  We note also that the trial court's order denying the motion presupposed that he had raised only the eighth-amendment claim, a presupposition that defendant's motion to reconsider did not dispute.  Nonetheless, we agree with defendant that his proposed successive petition did raise the issue (albeit not with the clarity to be expected of such an experienced postconviction litigant).  As the passages excerpted earlier show, the proposed petition did contend at several points that the trial court violated the proportionate-penalties clause.  In the interests of justice, we elect to disregard any forfeiture.

¶ 50    The State also contends that the supreme court's 1981 opinion on defendant's direct appeal bars defendant's claim, based on the doctrines of *res judicata* and law of the case.  The

State notes that the supreme court rejected defendant's argument that his sentence was unconstitutionally disproportionate to his offense; indeed, the court held that the sentence was not even an abuse of discretion. Thus, the State concludes, defendant may not reargue the matter. Defendant responds that neither *res judicata* nor law of the case applies here, because his claim is based on *Miller*, which postdated the supreme court's opinion, meaning that the "current scientific evidence" on which his claim relies was unavailable in 1981. We agree with defendant that, insofar as his proportionate-penalties claim is based on *Miller*, it is not automatically foreclosed by the proceedings on his direct appeal.[1] See *First Mortgage Co. v. Dina*, 2017 IL App (2d) 170043, ¶ 34 (law-of-the-case doctrine does not apply where claim is based on intervening change in law); *Statler v. Catalano*, 293 Ill. App. 3d 483, 486-87 (1997) (*res judicata* does not bar claim based on intervening change in law).

¶ 51 On the merits, the State contends that, because defendant's eighth-amendment claim fails section 122-1(f)'s prejudice test, his proportionate-penalties claim necessarily fails the prejudice test as well. The State relies on multiple pronouncements by our supreme court that the latter is "co-extensive" with the former. See *People v. Patterson*, 2014 IL 115102, ¶ 106; *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 206 (2009). *Konetski* cited *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006), which in turn relied on *People v. Sharpe*, 216 Ill. 2d 481, 517 (2005), in which the court restated its long-standing holding that "the proportionate penalties clause was clearly intended by the framers to be *synonymous* with the eighth amendment to the United States Constitution's cruel and unusual punishment clause." (Emphasis added.) See also *People v. McDonald*, 168 Ill. 2d 420 (1995) (record of 1970 Illinois Constitutional Convention shows that

---

[1] As we explain, however, defendant's claim is substantively not based on *Miller*, and *res judicata* in fact applies.

framers understood that proportionate-penalties clause was "synonymous" with cruel-and-unusual-punishment clause of eighth amendment (*id.* at 455) and thus the former provides "similar protections to those found under the eighth amendment (*id.* at 455-56). And the appellate court, relying on *Konetski*, has stated that the proportionate-penalties clause is to be interpreted "in lockstep" with the eighth amendment's cruel-and-unusual-punishment clause. *Consiglio v. Department of Financial & Professional Regulation*, 2013 IL App (1st) 121142, ¶ 41.

¶ 52     As we have noted, however, the supreme court has not been wholly consistent. See *Horta*, 2016 IL App (2d) 140714, ¶ 62. In *People v. Clemons*, 2012 IL 107821, ¶ 40, decided before *Patterson* but after *Konetski*, the court stated that the proportionate-penalties clause, "which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment." The *Clemons* court disapproved of prior opinions holding that the two clauses were synonymous. *Id. Patterson* did not cite *Clemons* but did cite *Rodney H.* for the proposition that the proportionate-penalties clause does not apply unless actual punishment has been imposed. *Patterson*, 2014 IL 115102, ¶ 106. Thus, we have held that the "coextensive" doctrine should be limited to the scope of the clause (actual punishment only) and not to the degree of protection afforded defendants who have suffered actual punishment. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 70. Notably, the absence of actual punishment was also the context in which *Consiglio* made its "lockstep" pronouncement, although that term implies complete coextensiveness. *Consiglio*, 2013 IL App (1st) 121142, ¶ 41.

¶ 53    In *Horta*, which involved a claim that a mandatory sentencing add-on violated both the eighth amendment and the proportionate-penalties clause, we declined to resolve the coextensiveness conundrum. We shall not make that attempt here, either.[2]

¶ 54    For purposes of this appeal, we shall assume, without actually holding, that the proportionate-penalties claim is not automatically defeated by the failure of the eighth-amendment claim. Even giving defendant this benefit, we conclude that his claim did not satisfy section 122-1(f)'s cause-and-prejudice test. It was neither incapable of being raised in his initial postconviction petition nor of any arguable merit such that its omission worked any prejudice.

¶ 55    We start with cause. Defendant does not claim that he could not have raised a proportionate-penalties argument in his initial postconviction petition. The clause was very much in existence then, and the historical fact on which his claim rests—his youth at the time of the offense—was known to all concerned. Moreover, the proposition that a defendant's youth is highly pertinent to determining the penalty for his crime was certainly established. Indeed, defendant himself cites an opinion from the nineteenth century stating that the law ought to and

---

[2] We recognize that, to the extent the foregoing supreme court precedents are conflicting or ambiguous, applying them here would essentially involve predicting how the court, based on these opinions, would decide the "coextensiveness" issue as it is raised here. As one jurist has stated, "The prophecies of what the courts will do in fact *** are what I mean by the law." Oliver Wendell Holmes Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 460-61 (1897). And, according to another jurist, the reliability of this predictive methodology as applied to our supreme court's precedents is disputed: "[S]ome say it is as reliable as [examining] bird entrails. Some say it is better." *Prewein v. Caterpillar Tractor Co.*, 123 Ill. App. 3d 687, 691 (1984) (Heiple, J., dissenting). We shall leave the matter for another day.

does make "a marked distinction between persons of mature age and those who are minors" because "[t]he habits and characters of the latter are, presumably, to a large extent as yet unformed and unsettled." *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894). Thus, the materials that defendant needed to assemble an argument that his sentence was unconstitutionally severe in light of his youth were already available when he filed his first postconviction petition. Indeed, the argument was available on his direct appeal, and he did contend that his sentence was an abuse of discretion in view of the goal of rehabilitation that the proportionate-penalties clause requires courts to consider in sentencing. And, even as long ago as the sentencing hearing, defendant argued that life imprisonment would be improper in view of his youth, especially considering his emotional immaturity.

¶ 56    Defendant contends, nonetheless, that his claim could not have been raised in his first petition, for the sole reason that, as of 2002, *Miller* had not been decided. Thus, he reasons, when he filed his initial petition, the Supreme Court had not yet required trial courts to consider certain mitigating factors that it later required in *Miller*.

¶ 57    Defendant's reasoning is unsound. Insofar as his proposed petition raised a claim of a proportionate-penalties violation at all, it was only that the trial court had failed to consider his youth as a factor in mitigation. This argument could have been raised in the first petition. The nonexistence of *Miller* until 2012 did not prevent defendant from raising this claim much earlier. It is true that *Miller* did announce a new *substantive rule of constitutional law*. This substantive rule, which is both binding and retroactive, is that statutorily mandatory life sentences without parole may not be imposed on defendants who were under age 18 at the time of their offenses. See *Montgomery*, 577 U.S. at ___, 136 U.S. at 733. To the extent that the proposed petition raised a claim based on this new *substantive rule of law*, as it attempted to do with its eighth-

amendment claim, there was cause for defendant's failure to raise the claim earlier. *Miller* created a new legal right.

¶ 58    The situation is different with respect to defendant's proportionate-penalties claim. The claim does not rest on the new substantive legal rule that *Miller* created. Instead, as defendant concedes, it rests on some of the *support* that the Court found for the new rule. This support— new research that reinforced the long-standing wisdom that juveniles have less impulse control, mental and emotional development, and fixity of character than do adults—did add to the received wisdom in favor of according a defendant's youth great weight in sentencing. But this new research was not a new rule of law. It did not create a constitutional right where none had existed before or impose new limits on the substantive law.

¶ 59    Defendant's argument that there was cause for his failure to raise his proportionate-penalties claim in his first petition cannot be sustained on the basis that *Miller* had not yet been decided. *Miller*'s nonexistence did not prevent defendant from contending that the trial court's alleged failure to consider his youth as a factor in mitigation violated the proportionate-penalties clause. *Miller*'s nonexistence as of 2002 merely deprived defendant of some helpful support for that claim. Surely, defendant's contention that this created "cause" proves too much. If the acquisition of new scientific knowledge to support an already viable claim were all that a defendant needed to show in order to raise the claim years late, then the "cause" requirement of section 122-1(f) would be a weak threshold indeed. It is one thing to hold, as the Court did, that a substantive rule of law applies retroactively to a case that has completed the direct-appeal process. *Id.* at ___, 136 S. Ct. at 736. It is quite another to hold that everything written in support of that new rule also applies retroactively and thus requires reopening a judgment that did not even implicate the new rule.

¶ 60   We conclude that the proportionate-penalties claim in defendant's proposed successive petition cannot survive the "cause" prong of section 122-1(f) of the Act.  We also conclude that defendant did not establish prejudice under section 122-1(f).  The failure to raise the claim in the first petition did not prejudice defendant, as including the claim would have changed nothing.

¶ 61   First, as phrased in the proposed petition, defendant's claim was not properly cognizable under the Act.  The Act is limited to claims of *constitutional* deprivation that were not and could not have been raised on direct appeal.  See 725 ILCS 5/122-1(a)(1) (West 2016); *People v. Whitfield*, 217 Ill. 2d 177, 181 (2005).  Although it invoked the proportionate-penalties clause, the proposed petition alleged only that the trial court ignored the factors of youth and rehabilitative potential that the clause required it to consider.  That fell short of contending that the life sentence itself violated the clause by being disproportionate to the offense.  Once it is acknowledged that defendant's proportionate-penalties claim is not truly a *Miller* claim, there is nothing constitutional about it.

¶ 62   But even were the claim one of constitutional dimension, and not mere garden-variety trial court error, it could have been raised on defendant's direct appeal (as it all but was).  Therefore, aside from being barred by the lack of cause, it would be barred by forfeiture (or *res judicata*).  See *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).  Further, although defendant alleged that his conduct in prison showed his rehabilitative potential, that assertion obviously did not raise a claim of constitutional error in the proceedings that resulted in his sentence.

¶ 63   Second, the substance of defendant's claim was rejected on direct appeal.  As noted, our supreme court rejected his contention that the trial judge refused to consider his youth and rehabilitative potential in mitigation.  The court noted that the judge had not been obligated to address these arguments in detail and that "the record indicate[d] a thorough consideration of the

factors constitutionally and statutorily designated for the trial judge's attention." *La Pointe*, 88 Ill. 2d at 493. Stripped of its spurious constitutional raiment, defendant's claim is no more than a sentencing-discretion or improper-factor argument that was resolved, however much to defendant's dissatisfaction, long ago. Thus, the State is ultimately correct that defendant's proportionate-penalties claim is barred by *res judicata*.

¶ 64    Third, defendant's attempt to establish prejudice fails because, insofar as the proposed petition even raised a substantive claim that his sentence violated the proportionate-penalties clause—as opposed to the claim that the trial judge failed to consider all of the factors that the clause required—that claim was insufficient.

¶ 65    Defendant cites two opinions that he contends support his assertion that his life sentence for murder was unconstitutional. Even were we free to disregard defendant's procedural default and the supreme court's rejection of any application of the proportionate-penalties clause to his case, we would find these opinions of no help to him. In *House*, which we discussed earlier, the defendant acted as a lookout for the people who actually killed the victims, and his life sentence was mandated by statute. Here, defendant was convicted of actually murdering the victim with premeditation. Thus, his case is dissimilar to *House* and more similar to *Pittman*, in which the appellate court upheld a mandatory life sentence for the defendant, who actually stabbed the three victims to death. *Pittman*, 2018 IL App (1st) 152030, ¶ 38.

¶ 66    Defendant's other citation is to *People v. Harris*, 2016 IL App (1st) 141744, *appeal allowed*, No. 121932 (Ill. May 24, 2017). There, the court held that the defendant's aggregate sentence of 76 years for one murder and one attempted murder violated the proportionate-penalties clause. The defendant had turned 18 a few months before the offenses. *Id.* ¶ 2. He actually shot both victims. *Id.* ¶¶ 4-15. At sentencing, the trial judge noted that he had

considered the defendant's lack of a prior record and other appropriate factors in mitigation but that several statutorily mandatory add-ons to the sentences greatly limited his discretion. *Id.* ¶ 15.

¶ 67 The appellate court held that the aggregate sentence violated the proportionate-penalties clause because it "shock[ed] the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society." *Id.* ¶ 69. After declining to read the clause as synonymous with the eighth amendment's cruel-and-unusual-punishment clause (*id.* ¶¶ 36-38), the court found *House* persuasive, even though the defendant in that case had been convicted as an accomplice who had not actually killed the victims. The court emphasized that the defendant was young, had committed no prior crimes at all, and had shown signs of rehabilitative potential. *Id.* ¶ 64.

¶ 68 In a partial dissent, one justice refused to endorse the extension of *House* to a defendant who had actually fired the weapon that killed one of the victims. *Id.* ¶ 85 (Mason, J., concurring in part and dissenting in part). Further, the defendant's actions involved considerable premeditation. *Id.*

¶ 69 Even were we able to overlook defendant's failure to satisfy the cause requirement of section 122-1(f) of the Act, and to disregard the supreme court's holding on defendant's direct appeal, we would hesitate to apply *Harris* to his case. In part, *Harris* is distinguishable in that defendant here had a prior criminal record (a conviction of burglary, a felony) as well as a short but disturbing history of antisocial acts, such as soliciting a robbery and the sneaking of drugs into the jail. Also, in *Harris*, the trial judge strongly suggested that he might have imposed a lesser sentence had his hands not been tied by the legislature; here, the judge's decision was discretionary and defendant's argument does not implicate the foregoing concern. Most

important, we find the *Harris* dissent persuasive in distinguishing between an accomplice who provided a lookout for the actual murderers and a murderer who acted with premeditation.

¶ 70    Defendant did not satisfy the cause-and-prejudice test for either claim that he sought to raise.  Therefore, the denial of leave to file the proposed successive petition must stand.

¶ 71    The judgment of the circuit court of Du Page County is affirmed.  As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.  55 ILCS 5/4-2002(a) (West 2016); see *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 72    Affirmed.