2020 IL App (3d) 130543-B

Opinion filed September 14, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-13-0543 Circuit No. 12-CF-1040 |
| | ) | |
| DEONTRAY E. JOHNSON, | ) ) | Honorable Kevin Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Carter and Schmidt concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Following a jury trial, defendant, Deontray E. Johnson, was convicted of first degree

murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)) and aggravated unlawful use of a weapon (*id.*

§§ 24-1.6(a)(1), (a)(3)) and sentenced to 80 years in prison. On appeal, he argues that (1) the

prosecutor made improper and prejudicial remarks regarding reasonable doubt during closing

arguments, (2) his *de facto* life sentence is unconstitutional under the United States Supreme

Court's holding in *Miller v. Alabama*, 567 U.S. 460 (2012), and (3) his sentence should be reduced

because the trial court failed to properly weigh the aggravating and mitigating factors.

¶ 2     In our original order, we affirmed defendant's conviction and sentence. We concluded, in part, that *Miller* applied only to actual sentences of life without the possibility of parole and declined to extend its rationale to an aggregate sentence of 80 years, even if that term amounted to a *de facto* life sentence.

¶ 3     Our supreme court denied defendant's petition for leave to appeal but directed us to vacate our prior judgment and

> "consider the effect of this Court's opinions in *People v. Buffer*, 2019 IL 122327, and *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and determine if a different result is warranted." *People v. Johnson*, No. 119814 (Ill. Mar. 25, 2020) (supervisory order).

After reconsidering the matter, we affirm in part, vacate in part, and remand for a new sentencing hearing.

¶ 4                                    I. BACKGROUND

¶ 5     At trial, Officer Jacob Faw testified that he was sitting in a parked police car facing Club Apollo in Peoria around 3 a.m. when he heard six gunshots and saw several people running from an empty lot across the street from the club. He got out of his car and approached the lot. He found six or seven people standing around a man who had been fatally shot. Faw later identified the man as Robreco King.

¶ 6     Dr. John Denton conducted an autopsy on King. He testified that a bullet entered King's back and severed his aorta, causing his death.

¶ 7     The State presented several witnesses who were at the club that evening. All of them testified that defendant and King got into a fist fight and that defendant was asked to leave.

2

Witnesses also testified that, shortly after defendant left, King walked across the street to the open lot where defendant and his friends had gathered and that shots were fired. None of the witnesses could identify defendant as the shooter.

¶ 8 The day after the club shooting, officers stopped a car driven by Zach Jones. Defendant was sitting in the passenger seat. Jones gave the officers consent to search the car, and they recovered a gun from the compartment in the armrest on the passenger side door.

¶ 9 Dustin Johnson, a forensic scientist for the Illinois State Police, stated that the gun found in the car was a .357 magnum revolver. He compared the gun to a bullet recovered from a vehicle at the scene and to bullet fragments removed from King's body. He opined that the bullet from the car was fired from the gun found in Jones's vehicle.

¶ 10 Sherrick Newborn testified that he was in federal custody awaiting sentencing for possession of a firearm. He stated that, in August 2012, he and defendant were jailed together. Defendant told him about an incident outside Club Apollo in which King threatened to beat up some of his friends. Defendant said that he ran to the car, leaned over it, and fired several shots at King.

¶ 11 Juan Nesbit also had several prior convictions and was awaiting sentencing for attempted armed robbery at the time of trial. Nesbit testified that in June 2012 he shared a cell with defendant. Defendant told him that he fired five shots at a man named King outside Club Apollo. Nesbit reported the statements to detectives, who then outfitted Nesbit with a wire. Once he was back in the cell, Nesbit asked defendant to tell him everything again. Defendant told him about the shooting and said that he shot King. Edited recordings of the conversations between Nesbit and defendant were published to the jury.

¶ 12 During closing arguments, the prosecutor made the following comments:

3

"So first we have to prove that the defendant performed the acts which caused the death of Robreco King, and I would submit to you we have done that beyond a reasonable doubt, and you will not receive any instruction about reasonable doubt. We are not allowed to define it in Illinois. That is up to you to decide as ladies and gentlemen of the jury, but I would submit that we have proven that beyond a reasonable doubt."

¶ 13    The jury found defendant guilty of first degree murder and aggravated unlawful use of a weapon. It also found that defendant personally discharged a firearm that proximately caused another person's death.

¶ 14    The presentence investigation report showed that defendant was 17 years old when he committed the offense. It also revealed that defendant committed multiple offenses as a juvenile, including aggravated robbery, for which a subsequent petition to revoke probation was filed following defendant's arrest on charges of aggravated robbery and possession of a stolen motor vehicle. He also had several traffic violations and a conviction for eluding a police officer. A review of defendant's student discipline report from high school also indicated that defendant had difficulty in school. He received suspensions on more than one occasion for violence and fighting. One report stated that he grabbed a female student in a "private area."

¶ 15    At sentencing, the trial court found in aggravation that defendant had a criminal history, that the nature and circumstances of the offense involved serious harm, and that it was necessary to sentence defendant to a significant term of imprisonment to deter others from committing the same crime. Before imposing sentence the trial court stated:

"I've considered the presentence investigation report and the evidence and arguments of counsel, the statement of allocution, the statement made—the words

4

of the defendant that he's presented and I've tried to consider the statutory matters in mitigation, aggravation, and the history and character of the defendant, and I've tried to give due regard for the circumstances and nature of the offense.

I would make the following findings: *** there are factors among other things that the Court should consider in aggravation. In other words, looking disfavorably upon the defendant when sentencing him. These things: that the defendant has a history of prior delinquency or criminal activity, that the defendant's conduct did cause or threaten serious harm that may be inherent in the offense, but it is what it is. And that the sentence given is necessary to deter others from committing the same crime, and that the defendant was on parole, was he not?"

Considering the factors in mitigation, the court simply remarked, "I'm hard pressed to [find] any."

¶ 16 At the conclusion of the hearing, the trial court found that the mandatory firearm statute applied, as well as consecutive sentencing requirements. It then sentenced defendant to a term of 50 years for first degree murder, with an additional 30-year enhancement for personally discharging a firearm, for a cumulative sentence of 80 years in prison.

¶ 17 Defendant moved to reconsider his sentence. In denying the motion, the trial court stated: "I'd only make the notation which I have in the past that the—the legislature simply sets out a sentencing scheme that, for lack of a better way to describe it, anyone that is convicted of committing murder and is the shooter of a handgun or shooter of a firearm in the commission of a murder starts at a 45-year sentence. Whether that's good or bad, it's simply the legislature's call and not ours, but I understand the issue."

¶ 18                                                    II. ANALYSIS

¶ 19                    A. Prosecutor's Comments During Closing Arguments

¶ 20        Defendant first contends that the prosecutor committed reversible error when she attempted to define reasonable doubt for the jury by stating that "it is up to you to decide [reasonable doubt] as ladies and gentlemen of the jury." Defendant acknowledges that he forfeited review of this claim but asks this court to consider the issue under the plain error rule.

¶ 21        Before we can determine whether plain error applies in this case, we must first determine whether an error actually occurred. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (to obtain relief under plain error, defendant must first show that a clear or obvious error occurred). Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) (citing *People v. Pittman*, 93 Ill. 2d 169, 176 (1982)). Although the United States Constitution does not prohibit courts from defining reasonable doubt (*Victor v. Nebraska*, 511 U.S. 1, 5 (1994)), Illinois law is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury (*People v. Speight*, 153 Ill. 2d 365, 374 (1992); *People v. Malmenato*, 14 Ill. 2d 52, 61 (1958)). The reasoning behind this rule is that "reasonable doubt" is self-defining and needs no elaboration. *Malmenato*, 14 Ill. 2d at 61.

¶ 22        In *People v. Downs*, 2015 IL 117934, ¶ 3, the defendant was charged with first degree murder and tried before a jury. During deliberations, the jury sent a note to the court asking for a definition of reasonable doubt. *Id.* ¶ 6. After discussing the question with both parties, the court responded with this written reply: " 'We cannot give you a definition it is your duty to define.' " *Id.* ¶¶ 6-7. After further deliberation, the jury found defendant guilty. *Id.* ¶ 7.

¶ 23        The defendant admitted that he had forfeited the issue on appeal but sought plain error review. The appellate court relied on *People v. Turman*, 2011 IL App (1st) 091019, and *People v.*

*Franklin*, 2012 IL App (3d) 100618, and held that the trial court's reply inappropriately defined reasonable doubt. *Downs*, 2014 IL App (2d) 121156, ¶¶ 23-28. It then concluded that the defendant met his burden to establish plain error and remanded for a new trial. *Id.* ¶ 44.

¶ 24     Our supreme court reversed the appellate court's decision, stating that the trial court's answer in response to the jury's inquiry was "unquestionably correct." *Downs*, 2015 IL 117934, ¶ 24. The court held that the trial court's reasonable doubt comment was not error and declined to apply the plain error doctrine. *Id.* ¶¶ 32-33. In reaching its decision, the court noted that the trial court's response honored the rule in Illinois that neither the court nor counsel should define reasonable doubt. *Id.* ¶ 24.

¶ 25     In this case, the prosecutor stated that "[reasonable doubt] is up to you to decide" and that the parties "are not allowed to define it in Illinois." In light of the supreme court ruling in *Downs*, we find no error in the prosecutor's comments; she did not attempt to define reasonable doubt, nor did she elaborate on its meaning. Her comments could not have been used to manipulate the standard by which the jury measured defendant's guilt. Thus, defendant has failed to show that a clear or obvious error occurred. We therefore decline to apply plain error review.

¶ 26                         B. *De Facto* Life Sentence

¶ 27     Next, defendant argues that his *de facto* life sentence is unconstitutional because the trial court failed to consider his youth and its "attendant characteristics" as required by *Miller v. Alabama*. He asks that we remand for resentencing with directions that the trial court consider the *Miller* factors in sentencing him, as a juvenile, for the offense of first degree murder.

¶ 28     The eighth amendment prohibits "cruel and unusual" punishment. U.S. Const., amend. VIII. "Inherent in that prohibition is the concept of proportionality." *Holman*, 2017 IL 120655, ¶ 33. Criminal punishment should be " ' "graduated and proportioned" ' " to both the offender and

7

the offense." *Miller*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). "When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment." *Holman*, 2017 IL 120655, ¶ 33.

¶ 29 In *Miller*, the United States Supreme Court held that the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Court stated, "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* The Supreme Court did not prohibit all life sentences for juveniles but stated that such sentences should "be uncommon" because of "children's diminished culpability and heightened capacity for change." *Id.* The *Miller* Court instructed sentencing courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 30 The Illinois Supreme Court has since held that *Miller* applies to discretionary sentences as well. *Holman*, 2017 IL 120655, ¶ 40. In *Holman*, our supreme court emphasized that the key issue is not whether the sentence was mandatory or discretionary but whether " 'a juvenile offender's youth and attendant characteristics' " were considered before determining that a life sentence was appropriate. *Id.* ¶ 38 (quoting *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016)). The *Holman* court held that life sentences for offenders under 18 years old, whether mandatory or discretionary, violate the eighth amendment if the trial court failed to specifically consider "some variant of the *Miller* factors." *Id.* ¶¶ 43-44. The court then concluded that a juvenile defendant may be sentenced to a life sentence "only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46.

8

¶ 31　　　　Recently, our supreme court clarified that a sentence over 40 years constitutes a *de facto* life sentence for a juvenile offender. *Buffer*, 2019 IL 122327, ¶¶ 40-41. It also succinctly stated that, to prevail under *Miller*, a defendant sentenced for a crime committed as a juvenile must show that (1) he was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider the unique characteristics attending youth. *Id.* ¶ 27.

¶ 32　　　　Here, defendant's cumulative 80-year sentence is indisputably a life sentence under *Buffer*. Thus, the trial court was required to consider defendant's youth and its unique characteristics prior to imposing his sentence. See *Holman*, 2017 IL 120655, ¶ 38. While the trial court stated that it considered the aggravating and mitigating factors, the court never mentioned defendant's age or his status as a juvenile offender. Moreover, there is no evidence that the court considered the unique characteristics of youth, such as defendant's propensity for reckless behavior or his inability to assess and appreciate the risks associated with his behavior. As noted in *Miller*, children are immature, irresponsible, reckless, impulsive, and particularly vulnerable to negative influences. See *Miller*, 567 U.S. at 471. Sentencing courts must consider a child's diminished culpability as well as the child's heightened capacity for change with age. *Id.* at 479.

¶ 33　　　　Further, the trial court's findings do not demonstrate that the court believed defendant was irretrievably depraved or so corrupt that he was beyond the possibility of rehabilitation. Although the trial court found that defendant was likely to commit another crime, that finding does not rise to the level of "irretrievable depravity" or "irreparable corruption" necessary to impose a life sentence. See *Holman*, 2017 IL 120655, ¶ 46; *cf. People v. Walker*, 2018 IL App (3d) 140723-B, ¶ 34 (affirming defendant's sentence of life in prison without parole where court's comments indicated that it believed the defendant showed no potential for rehabilitation).

¶ 34 The State argues that defendant's sentence is supported by several aggravating factors, including defendant's criminal history, his academic delinquency, his probation violation, and the need to deter others. We agree that these factors may warrant a life sentence in a nonjuvenile case. However, in sentencing a juvenile, as the court did here, such factors must be considered in a different light. The factors in aggravation and mitigation must be filtered through the lens of youth and the specific propensities that come with immaturity. For example, we now know that a life sentence is not likely to deter other juveniles from committing similar crimes. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 (observing that deterrence is diminished in juvenile sentencing cases because juveniles are less likely to consider possible punishment).

¶ 35 Under the circumstances, we vacate defendant's sentence and remand for a new sentencing hearing with instruction to consider defendant's youth and its attendant characteristics as required in *Miller*. On remand, defendant is entitled to be sentenced under the juvenile sentencing scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016) (added by Pub. Act 99-69, § 10 (eff. Jan. 1, 2016))). See *Buffer*, 2019 IL 122327, ¶ 47; *Holman*, 2017 IL 120655, ¶ 45; *People v. Smolley*, 2018 IL App (3d) 150577, ¶¶ 21-22.

¶ 36 In light of our determination, we need not consider defendant's claim that the court failed to properly weigh the aggravating and mitigating factors at sentencing.

¶ 37 III. CONCLUSION

¶ 38 For the foregoing reasons, we affirm defendant's conviction and vacate defendant's 80-year sentence. The cause is remanded for resentencing consistent with this decision.

¶ 39 Affirmed in part and vacated in part.

¶ 40 Cause remanded.

10

| | |
|---|---|
| **Cite as:** | *People v. Johnson*, 2020 IL App (3d) 130543-B |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 12-CF-1040; the Hon. Kevin Lyons, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |